**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **CAROLYN S. SAPP** | § | |
| | § | |
| **v.** | § | **NO. 1:07-cv-00650** |
| | § | |
| **JOHN POTTER,** | § | |
| *Postmaster General, United States* | § | |
| *Postal Service* | § | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

This *pro se* employment discrimination case is assigned to the Honorable Ron Clark, United

States district judge, and was referred to the Honorable Earl S. Hines, United States magistrate judge,

for all pretrial matters pursuant to a Referral Order entered on September 24, 2007.  On August 10,

2011, following *pro se* Plaintiff Carolyn Sapp's (Sapp) appeal to the United States Court of Appeals

for the Fifth Circuit, the case was reassigned to the undersigned United States magistrate judge, who

reinstated the case on the Court's active docket.  (See Docket No. 89.)  Pending is Sapp's "Amended

Motion for Summary Judgment" (Docket No. 132) and Defendant John Potter's (Potter), Postmaster

General of the United States,[1] "Motion for Summary Judgment" (Docket No. 129).

This case arises from incidents between Sapp and her subordinate employees in 2001.  These

employees filed several grievances concerning Sapp's management style, which often involved

verbally reprimanding the employees in public.  Her supervisors attempted to remedy the increasing

number of incidents, but Sapp stopped reporting to work on September 16, 2001.  Sapp filed a

complaint with the Equal Employment Opportunity Commission (EEOC) based on these incidents.

---

[1] "[T]he head of the department, agency, or unit . . . shall be the defendant in a Title VII action brought by a federal employee."  42 U.S.C. § 2000e-16(c) (2009).

Shortly thereafter, Sapp was diagnosed with major depression, dysthymia, and panic disorder. From 2002 to 2007, Sapp attempted to return to work, requesting light duty and reasonable accommodation – her physicians recommended that she should work in isolation because she does not work well with others. The United States Postal Service (USPS) refused to assign her to a noncompetitive vacancy or hire her for a competitive one. Eventually, Sapp filed the instant lawsuit, alleging claims for discrimination, hostile work environment, and retaliation. These claims arise under Title VII and the Rehabilitation Act.[2]

The summary judgment evidence offers no support for Sapp's claims. Sapp fails to satisfy the *McDonnell-Douglas* burdens for her discrimination and retaliation claims. Likewise, there are no genuine disputes regarding Sapp's failure-to-accommodate and hostile work environment claims. Accordingly, the Court should deny Sapp's summary judgment motion, grant Potter's summary judgment motion, and dismiss this lawsuit with prejudice.

## I.  Jurisdiction and Venue

The Court has subject-matter jurisdiction because this action arises under laws of the United States. See 28 U.S.C. § 1331. Venue is proper because a substantial part of the events giving rise to the claim occurred within the confines of this district. See 28 U.S.C. § 1391.

## II.  Factual Background

Sapp is an African-American resident of Beaumont, Texas. She began her career with the USPS on September 20, 1980. Subsequently, Sapp was promoted to the position of supervisor in

---

[2]  The Rehabilitation Act prohibits discrimination against an otherwise qualified individual with a disability in programs that receive federal funding, including the USPS. See 29 U.S.C. § 794(a) (2002); see also Jimenez v. Potter, 211 F. App'x 289, 291 (5th Cir. 2006). The act is the exclusive remedy for a federal employee alleging disability-based discrimination. Dark v. Potter, 293 F. App'x 254, 258 (5th Cir. 2008). Discrimination claims under the Rehabilitation Act are governed by the same standards as claims brought under the Americans with Disabilities Act (ADA). McKay v. Johanns, 265 F. App'x 267, 268 (5th Cir. 2008).

the Distribution Operations department at Beaumont's Remote Encoding Center (REC). At all times relevant to this lawsuit, Sapp was employed at this position. The functional purpose of this position is to supervise data entry operations that support the barcoding system and to coordinate remote encoding site operations with the processing and distribution plants served. A REC supervisor is responsible for supervising employees, scheduling and assigning work to the employees, establishing effective work team relationships, and meeting with union representatives to resolve disagreements.

A. Initial EEO #1 (1-G-774-0001-02)

   1. *Incidents with Subordinate Employees*

During the course of Sapp's employment as a supervisor at Beaumont's REC, she had several incidents with subordinate employees. In 1998 and 2000, subordinate employees stated on isolated occasions that Sapp was a "time bomb" and that they wanted to "kick her ass" for making them work overtime. In April 2001, two female subordinate employees showed Sapp a crude cartoon entitled "The Wonder Woman Girdle." Sapp issued seven-day suspensions to the employees. The American Postal Workers Union, AFL-CIO, filed a grievance regarding the discipline. An arbitration panel found that the cartoon did not constitute sexual harassment, sided with the union, and rescinded the suspensions. In May 2001, Sapp informed two of her supervisors, Don Hale and Danny Smith, that she intended to file an Equal Employment Opportunity (EEO) complaint alleging a hostile work environment due to her treatment by subordinate employees; however, Sapp did not file a complaint at that time.

In July and August of 2001, Sapp verbally reprimanded subordinate employees in public because of their perceived failures to comply with policies concerning the dress code and the length of breaks. During that time, six grievances were filed against Sapp. The employees alleged that Sapp

did not treat them with dignity and respect and that her management style created an unpleasant working condition.  Mr. Hale and Mr. Smith denied all of the grievances.

### 2. Don Hale's Proposed Solutions

Mr. Hale proposed three solutions to remedy the escalating issues between Sapp and her subordinate employees.  First, on August 16, 2001, he offered Sapp a development assignment at the post office in Nederland, Texas.  Sapp refused this assignment even though she had previously accepted temporary assignments at a number of different posts offices and had expressed interest in a lateral transfer to the Nederaland post office in 1998.  Second, on August 17, 2001, Mr. Hale encouraged Sapp to seek guidance through the Employee Assistance Program (EAP) to improve her interpersonal communication skills with her subordinate employees.  Sapp followed Mr. Hale's recommendation and received counseling through the EAP.  Finally, on September 10, 2001, Mr. Hale changed Sapp's schedule from a shift that started at 12:30 p.m. to the night shift, which started at 8:00 p.m.  Sapp had previously worked the night shift from 1994 through 2000.  After Mr. Hale changed her schedule, Sapp worked the night shift for approximately one week before she stopped reporting to work on September 16, 2001.

### 3. Initial EEO #1

On September 27, 2001, Sapp sought pre-complaint counseling with an EEOC counselor.  On October 29, 2001, Sapp was issued a Notice of Right to File Individual Complaint, and on November 8, 2001, she filed a formal EEO complaint, 1-G-774-0001-02, (Initial EEO #1).  This series of events, starting with the incidents with her subordinates and culminating with the change of Sapp's schedule, comprise the basis of Sapp's Initial EEO #1.

B. Amendment to Initial EEO #1 (1-G-774-0001-03)

*1. Buy-back of Annual Leave*

When Sapp stopped reporting to work on September 16, 2001, she requested the use of her sick leave. By the third pay period of 2002, Sapp had exhausted her sick leave. Consequently, from the fourth pay period through the eleventh pay period of 2002, the USPS continued to pay Sapp through annual leave. On May 30, 2002, Sapp requested that the USPS restore the annual leave and charge her leave without pay (LWOP) status for those pay periods. On September 11, 2002, the USPS sent Sapp an invoice to buy back her annual leave.

*2. Advanced Sick Leave*

On April 26, 2002, Sapp requested six weeks of advanced sick leave. In support of this request, Sapp submitted an April 11, 2002 letter from Rajen Desai, M.D., P.A., who stated that Sapp was "to be off work until further notice." On April 30, 2002, Danny Smith denied Sapp's request because allegedly neither she nor her doctor provided an anticipated date to return to work, which was required by the USPS's policy.

*3. Worker's Compensation Claim*

On December 18, 2001, Sapp submitted a Notice of Occupational Disease and Claim for Compensation to the United States Department of Labor, Office of Worker's Compensation (OWCP), claiming that she developed major depression, anxiety attacks, panic disorder, and poor sleep as a result of the hostile work environment at the Beaumont REC. On January 18, 2002, the OWCP prepared a letter requesting information from the USPS regarding Sapp's claim. The OWCP inadvertently failed to mail the letter. On May 31, 2002, the OWCP "resent" the letter to Mr. Smith, indicating that the USPS's failure to respond could result in the OWCP's acceptance of Sapp's

claim.  Mr. Smith responded the same day.  On June 21, 2002, the OWCP issued a Notice of Decision denying Sapp's claim because the evidence failed to show a lack of causation between her conditions and her employment at the USPS.  On three subsequent occasions – September 19, 2002, February 20, 2003, and July 7, 2003 – the OWCP upheld its denial of Sapp's claim.

### 4. Requested Forms

On October 9, 2002, and October 10, 2002, Sapp allegedly requested  "work-restriction" or "light-duty request" forms and information about reasonable accommodation from three supervisors – Tammie Rains, Sally Guidry, and Mr. Hale – who allegedly refused to provide the forms because they did not exist.  The supervisors told Sapp that if she wanted a referral to the District Reasonable Accommodation Committee (DRAC), she needed to submit a written request to a supervisor.

### 5. Light Duty and DRAC Requests

On December 5, 2002, Sapp submitted a written request to Mr. Smith, asking to return to work on light duty and a nomination for the DRAC.  In support of these requests, Sapp attached medical evaluations from three different physicians.  The first evaluation, from Ravikumar Kanneganti, M.D. P.A., diagnosed her with major depression, dysthymia, and panic disorder.  The report also contained the following limitations:

> [P]atient *should not have any further contact with previous supervisors or co-workers*.  She can do computer work, timekeeping, and monitoring.  *She should be relatively isolated from peers and supervisors outside of the Houston district* (up to a year and/or until federal case is resolved) since she is so *sensitive that there is a plot against her*.

(Def.'s Mot. Summ. J., Ex. 31, Docket No. 129) (emphasis added.)  The second evaluation, from Shama Quraishi, M.D., states only that "[t]his patient has been under my care and no longer has

limitation." (Id., Ex. 32.)  The third evaluation, from Jorge Raichman, M.D., P.A., diagnosed Sapp

with paranoid personality disorder.  (Id., Ex. 33.)  Dr. Raichman further suggested:

> [S]he should have no further contact [with] her previous supervisors, coworkers.
> Both parties are sensitized against each other.  Pt. will remain very suspicious of their
> intentions.  *She should work in a relatively isolated position* where she has very
> limited interactions with peers/public where she can do some form of timekeeping
> or monitoring.  *She is too suspicious to work [with] others closely* . . . . *She shouldn't
> be in a position where she can criticize others' work*, since she does it so poorly.

(Id.) (emphasis added.)

On December 12, 2002, Mr. Hale submitted a nomination form to the DRAC on Sapp's

behalf.  The DRAC found that Sapp was not disabled within the meaning of the Rehabilitation Act,

and that even if she was disabled, she was incapable of performing the essential functions of her

supervisor position with or without accommodation.  On May 8, 2003, Sapp requested

reconsideration of the DRAC denial from the Southwest RAC (SWRAC), which upheld the DRAC's

findings.  In July 2003, Sapp requested another reconsideration of the denial.  She attached an

updated medical evaluation from Dr. Kanneganti, which states:

> She should have no further contact with managers/supervisors Danny Smith, Don
> Hale, or Jennifer Henson.  She should have a modified work schedule of 7:00 - 3:30
> Sat/Sun, and supervise approximately 15-20 employees.

(Id., Ex. 36.)  On July 11, 2003, the DRAC upheld its denial, finding that her medical condition and

work restrictions had not changed.  Nonetheless, on September 3, 2003, Sapp requested a permanent

light duty assignment from Danny Smith, who denied the request because of the DRAC's and the

SWRAC's findings.

### 6.  *Amendment to Initial EEO #1*

On September 27, 2002, Sapp sought pre-complaint counseling with an EEOC counselor.

Sapp sought such counseling three additional times before filing a formal EEO complaint, 1-G-774-0001-003, (Amendment to Initial EEO #1) on November 20, 2002.  Sapp's Amendment to Initial EEO #1 was filed while Initial EEO #1 was still pending before the EEOC.  The amendment consists of all the activity that occurred from September 16, 2001 – the date Sapp stopped reporting to work – through September 10, 2003 – the date that Mr. Smith denied Sapp's request for permanent light duty.

C.  Consolidated EEO #1 (330-A2-8136X)

On June 17, 2003, Administrative Judge Guillory entered an order consolidating Sapp's Initial EEO #1 with her Amendment to Initial EEO #1.  The consolidated claims (Consolidated EEO #1) were also assigned a new number, 330-A2-8136X.  On October 20, 2003, Judge Guillory entered an order in which he summarized the issues in Consolidated EEO #1.  In Initial EEO #1, 1-G-774-0001-02, Sapp alleged claims for discrimination on the basis of her race, discrimination on the basis of her gender, and retaliation for prior EEO activity.  The events allegedly supporting those claims consisted of:

> (1) on 8/16/01 [Sapp] was asked to relocate duty assignment to the [Nederland] Post Office; (2) on 8/17/01 she was encouraged to seek guidance through the EPA program; (3) on 9/10/01 [Sapp's] schedule was changed without prior warning; and (4) in May 2001 management allowed [Sapp] to work in a hostile work environment.

(Def.'s Mot. Summ. J., Ex. 47., Docket No. 129.)  In Amendment to Initial EEO #1, 1-G-774-0001-03, Sapp alleged claims for discrimination on the basis of her race, discrimination on the basis of her disability, retaliation for prior EEO activity, and hostile work environment.  The events allegedly supporting those claims consisted of:

> (1) on August 24, 2002, she received a [copy] of an [OWCP] supervisor's statement which did not address the January 18, 2002 question asked by the OWCP concerning an injury she sustained in the performance of her duty; (2) on September 26, 2002,

she received an accounts receivable stating that she needed to pay an [invoice] before she could receive her annual leave . . . which the agency took without authorization; (3) on October 9, 2002, she requested a return to work/light duty form and information about the District Reasonable Accommodation from Acting Human Resources Specialist Tammie Rains, which was not received; (4) on October 10, 2002, her request to return to work/light duty form and District Reasonable Accommodation information was refused by Human Resources Specialist, Sally Guidry; (5) on October 12, 2002, her request to return to work/light duty form and District Reasonable Accommodation information from Don Hale was denied; (6) she had to wait more than 30 days for a response from the REC Manager to return to work after being off for 21 days; and (7) on March 17, 2003, she requested nomination to the Houston DRAC Committee for reasonable accommodation and she was not given an interactive assessment; and accommodation was denied.

(Id.)

On September 30, 2004, Administrative Judge Guillory entered a decision finding no discrimination, retaliation, or hostile work environment. On October 4, 2004, the USPS issued a Notice of Final Action affirming Judge Guillory's decision. On July 2, 2007, the EEOC's Office of Federal Operations (OFO) also affirmed Judge Guillory's decision.

D.  EEO #2 (1-G-774-0002-06)

   1.  Delayed Response

In 2006, Sapp made further attempts to return to work. On March 10, 2006, Sapp submitted a request to Mr. Smith for reasonable accommodation and a request to return to work. During the next two months, Sapp requested forms to return to work on three additional occasions. Like her requests in 2002, Potter contends the forms were not provided because they did not exist. Sapp alleges that Mr. Smith did not respond to her requests until May 12, 2006, and that this was an unreasonable delay. (Pl.'s Am. Mot. Summ. J., at 52, Docket No. 132.)[3] In an August 22, 2007

---

   [3] Sapp's argument is purportedly supported by an exhibit entitled "B." The undersigned has reviewed all of Sapp's exhibits, which number in the hundreds, and could not find an Exhibit B. However, "Exhibit AB1" attached to Docket No. 37 appears to be the same August 22, 2007 hearing transcript as Exhibit B. Therefore, the undersigned will refer to Exhibit AB1 when Sapp refers to Exhibit B.

EEOC hearing, Mr. Smith testified that he did not respond until that date because of the size and complexity of Sapp's file and because his facility was still recovering from Hurricane Rita.  (Id., Ex. AB1, at pt.2, 170:19-21, 173:11-18. )   Then, on May 26, 2006, he denied Sapp's request for a permanent light duty assignment because her medical condition and work restrictions had not changed since 2003.  Nonetheless, he instructed Sapp to submit current medical documentation to support her return-to-work requests.  On August 7, 2006, Sapp submitted a recent medical evaluation from Dr. Kanneganti, who stated that Sapp's medical condition and work restrictions remained unchanged.  (Def.'s Mot. Summ. J., Ex. 53, Docket No. 129.)

### 2.  DRAC Denial

Sapp was again referred to the DRAC for consideration of reasonable accommodation.  On November 9, 2006, Sapp's request was allegedly denied because her condition and work restrictions had not changed.  Sapp then submitted two requests for reconsideration – on November 28, 2006, and January 8, 2007 – that were also denied.

### 3.  Medical Evaluation

During this time, Sapp also believed that she was entitled to a "return to work" or "fitness for duty" examination, but the USPS did  not provide her with one.   (Pl.'s Am. Mot. Summ. J., Ex. AB1, at pt. 1, 110:19-115:5, Docket No. 132.)  Sapp alleges that Mr. Smith changed the procedures for her to return to work because he did not order the fitness for duty examination.  (See Pl.'s Memo., at 53-56, Docket No. 132.)   However, Sapp stated during an EEOC hearing that an examination was actually provided on November 28, 2006, which she attended.  (Pl.'s Am. Mot. Summ. J., Ex. AB1, at pt. 1, 115:1-5.)

*4. EEO #2*

On April 20, 2006, Sapp sought pre-complaint counseling with an EEOC counselor for retaliation and mental disability (continuing violation).  On June 12, 2006, Sapp filed a formal complaint, 1-G-774-0002-06 (EEO #2).  The events allegedly supporting Sapp's claims consist of:

> (1) on March 10, 2006 and May 26, 2006, management changed the procedure for [Sapp] to return to work; (2) on May 26, 2006, [Sapp] was notified that an assignment does not exist at the present location; management failed to consider [Sapp's] reassignment to another location; and [Sapp] was not given an appointment with the local physician for a final suitability as previously indicated.
> . . .
> [(3)] whether the agency unreasonably failed to accommodate [Sapp's] disability (dythymia/paranoid personality disorder) from March 10, 2006 and ongoing; and [(4)] whether Sapp has been subject to retaliation for prior EEO activity when: (a) on March 13, April 13 and April 22, 2006, [Sapp] requested forms to return to work but did not receive a response; (b) on November 9, 2007, [Sapp] was denied reasonable accommodation; and (c) [Sapp's] Nov. 8 2006 and Jan. 8, 2007 requests for reconsideration of the denial of her request for reasonable accommodation [were] not granted.

(Id., Exs. 60, 61.)

On September 12, 2007, Administrative Judge Wayne Kimball entered a decision finding no discrimination.  On September 24, 2007, the USPS entered a Notice of Final Action affirming Judge Kimball's decision.

## E.  Applications for Other Positions

During the pendency of the EEOC process, Sapp continued applying for or requesting assignments to various positions with the USPS.  On September 25, 2003, she applied for vacant supervisor positions in Beaumont, Orange, and Vidor, Texas.  (Pl.'s Am. Mot. Summ. J., Ex. M45, Docket No. 132.)  The applications were allegedly rejected because Sapp did not the meet eligibility requirements.  (Id.)  On May 14, 2007, she submitted applications for three additional positions – a supervisor position in Port Arthur, Texas, and postmaster positions in Batson and Gilchrist, Texas.

(Pl.'s Am. Mot. Summ. J., Ex. M90.)  USPS denied these applications on the grounds that the she did not meet the geographic area of consideration and the positions were allegedly outside of her "performance cluster." (Id., Ex. M91.)  Finally, on July 31, 2007, Sapp applied for two supervisor positions in Beaumont.  (Id., Ex. M99.)  She interviewed for one of the positions (id., Ex. M100), but was not awarded the job (see id., Ex. Z9).

Sapp alleges that the USPS's denial of her applications for these positions demonstrates that the USPS failed to reasonably accommodate her disability and retaliated against her for her EEOC activity.  She further alleges that she has been excluded from the following types of jobs: (1) "Customer Service, EAS 17"; (2) "Labor Relations Specialist, EAS 17"; (3) "Safety Specialist, EAS 16"; (4) "Secretary, EAS 12"; (5) "Postmaster, EAS 11"; (6) "Injury Compensation, EAS 11"; (7) "Text and Date Service Assistant, EAS 9"; and 8 "Postmaster, EAS 13."  (Pl.'s Memo., at 31-32, Docket No. 132.)  She purports to show that she applied for these positions through a lengthy exhibit compiling various vacancy announcements, but the exhibit does not reveal whether Sapp actually applied for the vacant positions.  (Pl.'s Am. Mot. Summ. J., Ex. U.)

F.  Termination of Employment

On June 11, 2007, the USPS issued a "Notice of Proposed Separation" based on management's perception that Sapp was unable to meet the requirements of her position.  (Id., Ex. M93.) However, on September 5, 2007, the USPS notified all of the employees at Beaumont's REC, including Sapp, that they would be released pursuant to a "reduction in force" (RIF).  (Id., Ex. M101.)  The next day, the USPS issued a "Letter of Decision" separating Sapp from employment, effective September 14, 2007, for failure to meet job requirements.  (See id., Ex. M104.) Subsequently, on November 1, 2007, the USPS rescinded both the June 11, 2007 Notice of Proposed

Separation and the September 6, 2007 Letter of Decision.  (Id.)  Like the other employees subject

to the RIF, Sapp's employment was terminated at the close of business on May 28, 2008.  From 2002

until the RIF, it appears that Sapp's LWOP status was uninterrupted.  For the reasons stated below,

the Court previously dismissed Sapp's claims arising from the termination of her employment.  (See

Docket Nos. 55, 61, 62, 82.)

### III.  Procedural Background

A.  Dismissed Claims

Sapp filed the instant lawsuit on September 24, 2007, alleging claims arising from

Consolidated EEO #1, EEO #2, EEO #3 (1-G-774-0005-07)[4], Merit System Protection Board

(MSPB) Appeal No. 1 (No. DA-0752-08-0030-I-1), MSPB Appeal No. 2 (No. DA-0752-08-0116-I-

1), and EEO #4 (1-G-774-0001-08).  On July 1, 2009, Potter filed a "Motion to Dismiss" (Docket

No. 35) contending that Sapp failed to exhaust all available administrative remedies for her claims,

except for Consolidated EEO #1 and EEO #2.  At that time, this case was referred to the Honorable

Earl S. Hines, United States magistrate judge, who entered a report (Docket No. 55) recommending

that the Court dismiss all of Sapp's claims except for Consolidated EEO #1 and EEO #2.  On March

25, 2010, the Honorable Ron Clark, United States district judge, entered an Order (Docket No. 61)

adopting the magistrate judge's report and recommendation and a Partial Final Judgment (Docket

No. 62).  Sapp appealed the Partial Final Judgment to the United States Court of Appeals for the

Fifth Circuit, which affirmed the judgment of the District Court.

---

[4] EEO #3 concerned the June 11, 2007 Notice of Proposed Separation, the September 6, 2007 Letter of
Decision, and the RIF.  (See Report and Recommendation 7, Docket No. 55.)

B.  Potter's Summary Judgment Motion

Pending is Potter's summary judgment motion.  Potter requests dismissal of Sapp's claims on the following grounds: (1) Mr. Hale's actions in August and September of 2001 do not support a *prima facie* case of discrimination based on race, sex, or retaliation; (2) if Sapp has established a *prima facie* case, Potter has articulated legitimate, non-discriminatory reasons for Mr. Hale's conduct, and Sapp has failed to show that those reasons are a mere pretext or part of an unlawful mixed motive; (3) the USPS's handling of Sapp's leave issues and the alleged non-responsiveness of Sapp's supervisors to her requests for forms and information do not support a *prima facie* case of discrimination based on race or retaliation; (4) if Sapp has established a *prima facie* case, Potter has articulated legitimate, non-discriminatory reasons for the handling of Sapp's leave issues and her supervisors' conduct, and Sapp has failed to show that those reasons are a mere pretext or part of an unlawful mixed motive; (5) Sapp cannot establish a *prima facie* case of retaliation based on her efforts to return to work in 2006; (6) Sapp cannot establish a *prima facie* case of hostile work environment; and (7) Sapp cannot establish a *prima facie* case of disability discrimination.  (Def.'s Mot. Summ. J., at 21, Docket No. 129.)

C.  Sapp's Summary Judgment Motion

Sapp's Amended Motion for Summary Judgment is also pending.  The motion amends her original "Motion for Summary Judgment" (Docket No. 64), filed April 1, 2010.  The motion contains a section entitled "Genuine Material Facts" which consists of nineteen different subparts. Most of the subparts are filled with evidence supporting Sapp's claims.  The undersigned construes these subparts as an attempt to show that there are no genuine disputes as to Sapp's claims and that she is entitled to judgment as a matter of law.

## 1.  Equitable Tolling

Three of the subparts in Sapp's summary judgment motion relate to preliminary matters.  In the first subpart, Sapp argues that the statute of limitations is equitably tolled for her claims.  (Pl.'s Memo., at 8, Docket No.  132.)  Federal regulations require an aggrieved employee to contact an EEOC counselor within forty-five days of the alleged discriminatory conduct.  29 C.F.R. § 1614.105(a) (2012); Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002).  Potter argues that any incidents occurring prior to August 13, 2001, such as the cartoon incident, are outside the actionable period because Sapp did not meet with an EEO counselor until September 27, 2001.  In the Fifth Circuit it is unclear whether administrative exhaustion is a prerequisite subject to equitable tolling or an issue of subject matter jurisdiction.  Patton v. Gonzales, 197 F.App'x 309, 312 (5th Cir. 2006) (unpublished).  Assuming arguendo that the doctrine of equitable tolling is available to Sapp, she has failed to identify any grounds for equitable tolling (see Pl.'s Memo, at 8-9), and the undersigned's independent review of the evidence confirms that the doctrine is not applicable in the present case.  See Patton, 197 F.App'x at 312 (listing grounds for equitable tolling).  Accordingly, any incidents occurring prior to August 13, 2001, are outside the actionable period.

## 2.  Claims Before the Court

In the second and third subparts, Sapp argues that all of the issues in her complaint are properly before the Court and that the Partial Final Judgment dismissed claims that should not have been dismissed.  Both arguments are without merit.  The Fifth Circuit affirmed the District Court's order adopting the magistrate judge's report and recommendation, which correctly delineated Sapp's remaining claims.  Sapp's remaining claims arise from Consolidated EEO #1 and EEO #2, as described above.  To the extent that there are any claims that could reasonably be expected to grow

from Sapp's EEOC complaints, the undersigned will also consider those claims.  See Thomas v.

Dep't of Criminal Justice, 220 F.3d 389, 395 (5th Cir. 2000); Silva v. Chertoff, 512 F.Supp.2d 792,

812 n. 97 (W.D. Tex. 2007).

> *3. Staggering Record*

Finally, it is necessary to address the staggering record in this case.  Throughout the course

of this litigation, Sapp has filed several hundred exhibits, which amount to thousands of pages of

potential summary judgment evidence.  Both the Local Rules for the Eastern District of Texas and

the Federal Rules of Civil Procedure require Sapp to support her claims with appropriate citations

to the summary judgment evidence.  See Fed. R. Civ. P. 56(c)(1); E.D. Tex. Loc. R. CV-56(d).  To

the extent Sapp provided such citations, the undersigned analyzed the summary judgment evidence

located in the record.  However, the undersigned is not required to scour the record in an attempt to

determine whether the record contains an undisclosed genuine dispute of material fact before

entering summary judgment.  See id.  If Sapp believes the undersigned failed to consider a particular

exhibit – or a page of an exhibit – that supports her claims, she should have directed the Court's

attention to that evidence – or heeded the Court's earlier warnings regarding the problems with filing

such a large number of exhibits, many of which are duplicative.

For the reasons stated below, Potter's summary judgment motion should be granted, Sapp's

summary judgment motion should be denied, and this lawsuit should be dismissed with prejudice.

### IV. Summary Judgment Standard

Summary judgment shall be rendered when the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a); accord United States ex rel. Jamison v. McKesson Corp., 649 F.3d 322, 326 (5th Cir. 2011).

A dispute is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material when it is relevant or necessary to the ultimate conclusion of the case.  Id.

The movant has the burden to identify "each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "If the dispositive issue is one on which the non-moving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim."  Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'Ship, 520 F.3d 409, 412 (5th Cir. 2008) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  The movant must support its assertion by "citing to particular parts or materials in the record, . . . showing that the materials cited do not establish the . . . presence of a genuine dispute, or [showing] that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The citations to the summary judgment evidence should be specific.  See Smith v. United States, 391 F.3d 621, 625 (5th Cir. 2004).  Summary judgment must be denied when the movant fails to meet its initial burden, regardless of the nonmovant's response.  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

If the movant satisfies its burden, the burden then shifts to the nonmoving party to show that specific facts exist over which there is a genuine dispute.  Id. (citing Celotex, 477 U.S. at 325).  Like the movant, the nonmovant must satisfy its burden through specific citations to the summary judgment evidence.  See Fed. R. Civ. P. 56(c)(1); Smith, 391 F.3d at 625.  "If somewhere in the record there is evidence that might show a dispute of material fact, the district court needs to be pointed to that evidence as opposed to having to engage in an extensive search."  Hernandez v.

Yellow Transp., Inc., 670 F.3d 644, 651 (5th Cir. 2012).  "Conclusory allegations, speculation, and

unsubstantiated assertions are inadequate to satisfy the nonmovant's burden . . . ."  Ramsey, 286 F.3d

at 269 (quoting Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1429 (5th Cir. 1996)) (internal

quotations omitted).  "[T]he court must draw all reasonable inferences in favor of the nonmoving

party, and it may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson

Plumbing Prods., 530 U.S. 133, 150 (2000).

### V. Summary Judgment Burdens in Employment Discrimination or Retaliation Context

A distinct subset of analytical principles applies when a motion for summary judgment is

filed in an employment discrimination or retaliation case.  A plaintiff-employee may prove

discrimination or retaliation either by direct or circumstantial evidence.  See McCoy v. City of

Shreveport, 492 F.3d 551, 556 (5th Cir. 2007).  "Direct evidence is evidence that, if believed, proves

the fact of discriminatory [or retaliatory] animus without inference or presumption."  West v. Nabors

Drilling, USA, Inc., 330 F.3d 379, 384 n.3 (5th Cir. 2003) (internal quotations omitted).

When, as here, a plaintiff-employee relies on circumstantial evidence, courts within the Fifth

Circuit apply a modified *McDonnell-Douglas* framework that involves shifting burdens of

production to determine whether an action warrants a plenary trial.  McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 802-804 (1973); Keelan v. Majesco Software, Inc., 407 F.3d 332, 341 (5th Cir.

2005) (describing the Fifth Circuit's modified *McDonnell-Douglas* approach to employment

discrimination cases where a mixed-motive analysis might apply).  Under the *McDonnell-Douglas*

framework, the plaintiff-employee has the initial burden to make a *prima facie* showing of

discrimination or retaliation.  McInnis v. Alamo Cmty. College Dist., 207 F.3d 276, 279-80 (5th Cir.

2000).  To satisfy this burden, the plaintiff need only make a very minimal showing.[5]  Nichols v. Loral Vought Sys. Corp., 81 F.3d 38, 41 (5th Cir. 1996) (quoting Thornbrough v. Columbus & Greenville R.R. Co., 760 F.2d 633, 639 (5th Cir. 1985)) (internal quotations omitted).

Once the plaintiff-employee makes this showing, the burden shifts to the defendant-employer to articulate a legitimate, non-discriminatory or non-retaliatory reason for the adverse employment action.  McInnis, 207 F.3d at 280.  "The defendant may meet this burden by presenting evidence that if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."  Nichols, 81 F.3d at 41 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-08 (1993)) (internal quotations omitted).  This burden does not involve a credibility assessment.  Reeves, 530 U.S. at 142.

If the defendant-employer articulates a legitimate non-discriminatory or non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff-employee to offer sufficient evidence to create a genuine dispute that the defendant-employer's reason was either: (1) not true, but a mere pretext for unlawful discrimination or retaliation (pretext alternative); or (2) true, but only one of the reasons for its conduct, and another motivating factor is the plaintiff-employee's protected characteristic (mixed-motive[s] alternative).  Rachid v. Jack In The Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004).  The plaintiff satisfies this burden if a rational fact finder could find in her favor.  See Hernandez, 670 F.3d at 660 (citing Patel v. Midland Mem'l Hosp. & Med. Ctr., 298 F.3d 333, 342-43 (5th Cir. 2002)).

---

[5] In the analysis below, the undersigned describes the different *prima facie* burdens for Sapp's discrimination and retaliation claims under Title VII and the Rehabilitation Act.

Under the pretext alternative approach, the plaintiff must show evidence of disparate treatment or evidence demonstrating that the employer's explanation is false or unworthy of credence. See Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003). "Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's *prima facie* case, is likely to support an inference of discrimination without further evidence of [the] defendant's true motive." Id. "The 'rare' instances in which a showing of pretext is insufficient to establish discrimination are (1) when the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or (2) when the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue, and there was abundant and uncontroverted evidence that no discrimination occurred." Id. (citing Russell v. McKinney Hospital Venture, 235 F.3d 219, 222 (5th Cir. 2000)).

Under the mixed-motive approach, the plaintiff must show that her protected characteristic was a motivating factor in the employment decision. Keelan v. Majesco Software, Inc., 407 F.3d 332, 341 (citing Rachid, 736 F.3d at 312). If the plaintiff makes such a showing, then the defendant must "prove that the same adverse employment decision would have been made regardless of discriminatory animus." Id, (quoting Rachid, 736 F.3d at 312) (internal quotations omitted). The plaintiff prevails if the employer fails to carry this burden. Id,

In the analysis below, the undersigned applies this burden-shifting framework to Sapp's discrimination and retaliation claims under Title VII and the Rehabilitation Act.

## VI. Discrimination (Disparate Treatment) Under the Rehabilitation Act

A. *Prima Facie* Case of Discrimination (Disparate Treatment) Under the Rehabilitation Act

To establish a *prima facie* case of discrimination under the Rehabilitation Act, the plaintiff must show: (1) that she has a disability; (2) she is an individual qualified for the job in question; (3) she worked for a program or activity receiving federal financial assistance; and (4) an adverse employment decision was made solely because of this disability.  McKay v. Johanns, 265 F. App'x 267, 268 (5th Cir. 2008) (citing 29 U.S.C. § 794(a); Hileman v. City of Dallas, 115 F.3d 352, 353 (5th Cir. 1997)).  Sapp is unable to establish the second and fourth elements of her *prima facie* case.

*1. Qualified for the Job in Question*

The Fifth Circuit applies a two-part test to determine whether the individual is qualified for the job in question: (1) whether the individual could perform the essential functions of the job – those that bear more than a marginal relationship to the job at issue; and (2) if (but only if) the individual is not able to perform the essential functions of the job, whether any reasonable accommodation[6] would enable her to perform those functions.  Chandler v. City of Dallas, 2 F.3d 1385, 1393-94 (5th Cir. 1993).  The plaintiff has the burden to show that she is otherwise qualified. Id.  at 1394.

---

[6]  The ADA provides that: "The term 'Reasonable Accommodation' may include— (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9) (2009).  The federal regulations define the term "reasonable accommodation," in part, as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(ii) (2012).

At all times relevant to this lawsuit, Sapp was employed as a supervisor in the Distribution Operations department at Beaumont's REC.  The position's primary responsibilities include supervising data conversion operators, establishing effective team relationships, and meeting with union representatives to resolve disagreements.  (Def.'s Mot. Summ. J., Ex. 1, Docket No. 129.)

The majority of Sapp's early medical evaluations state that it is necessary for Sapp to work in isolation because she does not work well with others.  (See id., Exs. 31-33.)  Of the three evaluations, only Dr. Quraishi's evaluation states otherwise.  (See id., Ex. 32.)  That evaluation provides, in its entirety: "This patient has been under my care and no longer has limitations."  (Id.)  In July 2003, after being rejected by the DRAC and the SWRAC, Sapp provided an updated evaluation from Dr. Kanneganti.  (Id., Ex. 36.)  Sapp provided this evaluation after the majority of the below, alleged adverse employment actions occurred.  The evaluation states that Sapp should still have no interaction with her previous supervisors but that she could supervise a small number of employees.  (Id.) Setting aside Dr. Quraishi's single-sentence evaluation, all of Sapp's early evaluations, require her to work in isolation, and all of the evaluations, including Dr. Kanneganti's updated evaluation, state that Sapp should not have *any contact with the employees at Beaumont's REC*.  (Id. Exs. 31-33, 36.)

Based on these evaluations,  Sapp's medical conditions – major depression, dysthymia, panic disorder, and/or personality disorder – prevent her from performing the essential functions of supervisor at Beaumont's REC.  See Chandler, 2 F.3d at 1393-94.  Likewise, given the number of grievances that were filed against Sapp in July and August of 2001 and the union's criticism of Sapp's management style, it is also unlikely that she would be able to resolve disagreements with union representatives.  (See id., Exs. 3, 4.)  Finally, Sapp has not shown that there is any reasonable

accommodation enabling her to effectively work with these co-workers or the union.  Accordingly, Sapp has failed to establish a *prima facie* case of disability discrimination.  See Chandler, 2 F.3d at 1393-94.

### 2.  Adverse Employment Action

For a discrimination claim under the Rehabilitation Act, adverse employment actions  are "ultimate employment decisions," such as hiring, granting leave, discharging, promoting, or compensating.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006); McKay, 265 F. App'x at 269; McCoy, 492 F.3d at 560.  None of the incidents discussed below constitute adverse employment actions.

### a.  Incidents occurring before Sapp stopped reporting to work

No adverse employment actions occurred before Sapp stopped reporting to work in 2001. For example, Donald Hale's proposal to send Sapp to a temporary development assignment in Nederland, Texas, was not an adverse employment action because there is no evidence indicating that the assignment would have made Sapp's employment objectively worse.  See Cooper v. United Parcel Servs., 368 F.App'x 469, 474 (5th Cir. 2010) ("An employment transfer may qualify as an adverse employment action if the change makes the job objectively worse.") (citations omitted); Joseph v. Potter, H-04-1886, 2006 WL 1581894, at *5 (S.D. Tex. June 6, 2006) (holding that a threat of reassignment is non-actionable).  Likewise, Sapp has failed to explain how her participation in the EAP affected her employment status.   The EAP was merely a program designed to help employees with their problems.  (Def.'s Mot. Summ. J., Ex. 48, at 617:6-10, Docket No. 129.) Finally, Sapp's schedule change does not constitute an adverse employment action because there is no evidence that the change would have affected Sapp's compensation, duties, or benefits.  See, e.g.,

Smith v. Potter, 629 F.Supp.2d 644, 651-52 (S.D. Miss. 2009) (summarizing Fifth Circuit opinions holding that a schedule change is not an adverse employment action); accord Cooper, 368 F.App'x at 474.

    *b. Leave issues*

On April 26, 2002, the USPS denied Sapp's request for six-weeks advanced sick leave. (Def.'s Mot. Summ. J., Exs. 15-18, Docket No. 129.) Sapp has not identified any pecuniary loss by the USPS's denial of that request, and the summary judgment evidence shows that Sapp exhausted all of her sick leave well before April 2002. (See id., Ex. 48, at 612:4-613:22.) Likewise, the USPS automatically placed Sapp on annual leave when her sick leave ran out. (Id.) This decision was not punitive in nature, and thus, does not constitute an adverse employment action. See, e.g., McCoy, 492 F.2d at 559 (holding that paid leave is not an adverse employment action for purposes of discrimination). Finally, when the USPS sent Sapp an invoice to buy back her annual leave, it was merely attempting to comply with Sapp's requests to reinstate the leave and to place her on LWOP status. (See id. at 313:24-315:1; Ex. 29.) This incident was a clerical issue, rather than one involving an ultimate employment decision. Administrative matters, such as those listed above, do not constitute adverse employment actions. See Benningfield v. City of Houston, 157 F.3d 369, 376-78 (5th Cir. 1998) (citing Dorsett v. Bd. of Trustees for St. Colls. & Univ., 940 F.2d 121, 123-24 (5th Cir. 1991) (holding that being assigned a heavy work load and not receiving overtime and travel reimbursement are non-actionable); Craven v. Gonzalez, No. 4:05-cv-00709, 2006 WL 133477, at *8 (S.D. Tex. Jan. 17, 2006) (holding that denial of annual leave on one occasion is non-actionable).

### c.  Additional administrative matters

The remaining incidents allegedly supporting Sapp's discrimination claims are similarly non-actionable.  First, she argues that the USPS unreasonably delayed its response to an OWCP inquiry concerning her in 2001 and 2002.[7]  Second, Sapp alleges that the USPS failed to timely respond to her light duty requests in 2002, 2003, and 2006.  Third, she argues that the USPS failed to provide "work-restriction" or "light-duty request" forms in 2002 and 2006.  Finally, Sapp alleges that the USPS failed to provide a "return to work" examination in 2006.  None of these administrative matters constitute adverse employment action.  See Benningfield, 157 F.3d at 376-78.  Accordingly, for these reasons, Sapp has also failed to establish a *prima facie* case of disability discrimination. See Chandler, 2 F.3d at 1393-94.

## B.  Legitimate, Non-Discriminatory Reasons

Assuming *arguendo* that Sapp established a *prima facie* case of disability discrimination, Potter has satisfied his burden of articulating legitimate, non-discriminatory reasons for the allegedly adverse employment actions discussed above.  See McInnis, 207 F.3d at 280.

With respect to the incidents occurring before Sapp stopped reporting to work, Potter has explained that Sapp's supervisors were merely trying to remedy the increasing number of incidents between Sapp and her subordinate employees.  For example, Mr. Hale testified that he proposed sending Sapp on a development assignment to Nederland, Texas, because she previously had a positive experience working at that location.  (Def.'s Mot. Summ. J., Ex 48, at 737:4-22; Ex. 6, Docket No. 129.)  Likewise, Mr. Hale suggested that Sapp enroll in the EAP to help her develop

---

[7]  Federal regulations provide that if an agency fails to reply to an OWCP inquiry within thirty days, OWCP may accept the claimant's report of injury as established.  20 C.F.R. § 10.117 (2012).  Assuming *arguendo*, that this administrative matter could constitute an adverse employment decision, in the present case, the USPS's "delayed response" only worked to Sapp's benefit.  See id.

interpersonal communications skills.  (Id., Ex. 7; Ex. 48, at 617:11-18.)  Finally, Mr. Hale testified at an EEOC hearing that he changed Sapp's schedule so that she would no longer have to supervise the subordinate employees with whom she was having problems.  (Id., Ex. 48, at 618:1-25.)

Likewise, Potter has articulated legitimate, non-discriminatory reasons for the incidents concerning Sapp's leave.  The USPS's Advanced Sick Leave Policy suggests that a request for advanced sick leave will be denied if an anticipated return to duty date is not provided.  (Id., Ex. 15.)  Sapp's April 26, 2002 request for six-weeks advanced sick leave and the corresponding note from her physician did not contain an anticipated return date, and Potter explains that Sapp's request was denied for this reason.  (Id., Ex. 48, at 612:4-613:22.)  Potter also explains that the USPS automatically placed Sapp on annual leave once her sick leave was exhausted, and when Sapp requested that the USPS reinstate her annual leave, it merely sent her an invoice in compliance with the request.  (Id. at 313:24-315:1; Ex. 29.)

Potter has also satisfied his burden with respect to the miscellaneous administrative incidents discussed above.  First, Potter reasons that Sapp's supervisors did not respond to the OWCP inquiry until May 31, 2002, because OWCP inadvertently failed to mail the correspondence in January 2002.  (Id. at 726:20-727:14.)  Second, Potter provides correspondence showing that the USPS did not fail to timely respond to Sapp's light duty requests in 2002 and 2003.  (Id.,Exs. 30-39.)  Potter further explains that it took a few months to respond to Sapp's request in 2006 because of the size and complexity of Sapp's file and because their facility was still recovering from Hurricane Rita.  (Id., Ex. 62, at 170:19-21, 173:11-18. )  Third, Potter provides the testimony of Mrs. Rains, Mrs. Guidry, and Mr. Hale, who testified: (1) that the USPS does not have work-restriction or light-duty request forms; (2) Sapp requested these forms because she wanted a reasonable accommodation or light-duty

assignment; and (3) and they explained that she needed to submit a written request to a supervisor. (Id., Ex. 48, at 228:4-229:7, 244:10-245:3, 312:13-21, 320:6-321:6, 613:25-615:1.)  Finally, the summary judgment evidence shows that Sapp was actually provided a fitness for duty examination in 2006  (Pl.'s Am. Mot. Summ. J., Ex. AB1, at pt. 1, 115:1-5) even though she was not entitled to one, see Employee and Labor Relations Manual § 865.1 (explaining that management has the discretion to order an examination),  available at, the USPS website, http://usps.com (search "ELM 865"; then follow hyperlink) (last visited July 24, 2012).[8]  Accordingly, for the reasons stated above, Potter has satisfied his burden under the McDonnell-Douglas framework.  See Reeves, 530 U.S. at 142; McInnis, 207 F.3d at 280; Nichols, 81 F.3d at 41.

## C.  Pretext or an Unlawful Mixed Motive

Assuming arguendo that Sapp established a prima facie case of disability discrimination, Potter has articulated legitimate, non-discriminatory reasons for the alleged adverse employment actions, and therefore, Sapp would have the burden to show pretext or an unlawful mixed motive. See Rachid, 376 F.3d at 312.  Having considered Sapp's arguments and the summary judgment evidence, no rational factfinder could find that Potter's reasons are a mere pretext or part of an unlawful mixed motive.

### 1.  Pretext

To satisfy her burden through the pretext alternative approach, Sapp would have to show evidence of disparate treatment or evidence demonstrating that Potter's explanations are false or unworthy of credence.  See Laxton, 333 F.3d at 578.  Sapp's arguments are based on the latter type

---

[8] During the EEOC hearing, Sapp questioned Mr. Smith regarding ELM 865.1, and he testified that he followed the procedure set forth in that section.  (Def.'s Mot. Summ. J., Ex. 62, at 150:16-151:24, Docket No. 129.)

of evidence.[9]  (See Pl.'s Resp., at 6-16, Docket No. 141.)  In the analysis below, the undersigned addresses the explanations that Sapp believes are false.  (See id.)

### a.  Failure to provide forms

In 2002 and 2006, Sapp alleges that her supervisors did not provide "work-restriction" or "light-duty request" forms when she requested them.  Potter responds with testimony from these supervisors, who testified that Sapp needed to submit a written request to her supervisor, rather than filling out a form, to obtain the desired relief.  (Def.'s Mot. Summ. J., Ex. 48, at 228:4-229:7, 244:10-245:3, 312:13-21, 320:6-321:6, 613:25-615:1, Docket No. 129.)  Sapp replies by citing the EEOC hearing testimony of Lenora Gilchrist and Ms. Rains.  (Pl.'s Resp., at 6, Docket No. 141.)

The testimony cited by Sapp only lends credence to Potter's explanation.  Lenora Gilchrist testified that she had never seen the form that Sapp presented to her, but it was substantively similar to a written request for light-duty assignment.  (Def.'s Mot. Summ. J. Ex. 48, at 184:5-185:22.)  Likewise, Mrs. Rains testified that Sapp had intended to request a light-duty assignment.  (Id. at 229:17-232:3.)  Finally, Mrs. Guidry testified that there is no light-duty form but that a request for light-duty assignment must be made in writing and presented to a supervisor.  (Id. at 269:2-270:3.)  Accordingly, there is no genuine dispute that the forms do not exist.

### b.  Failure to timely respond to return-to-work request

On December 5, 2002, Sapp submitted a written request for light duty and reasonable accommodation to Mr. Smith.  (Pl.'s Mot. Summ. J., Ex. M29; Ex. CC, at 320.)  Sapp alleges that

---

[9]  In Sapp's summary judgment motion, there is a subpart entitled "Ms. Sapp treated less favorable than other similar situated employees."  (Pl.'s Memo., at 33, Docket No. 132.)  In that subpart, Sapp's argument is limited to the USPS's alleged failure to reasonably accommodate her disability.  (Id. at 33-35.)  She does not discuss any of the alleged adverse employment actions referenced above.  (See id.)  The undersigned's independent review of the summary judgment evidence also confirms that there is no evidence of disparate treatment with respect to the above actions.

she did not receive a response until March 13, 2003, when the DRAC denied her request.  (Id., Ex. BB, at 520.)  Potter explains that there was no delay, and he provides the nomination form that Don Hale submitted to the DRAC on December 12, 2012 – exactly one week from Sapp's written request. (Def.'s Mot. Summ. J., Ex. 34.)  Sapp attempts to show that Potter's explanation is a pretext by demonstrating that the USPS refused to allow her to return to work on December 16, 2002.  (Pl.'s Resp., at 7, Docket No. 141.)  It is unclear how this alleged refusal demonstrates that the USPS's explanation for the "delay" is false or unworthy of credence.

Sapp argues that a similar incident also occurred in 2006.  On March 14, 2006, Sapp sent correspondence to Danny Smith, requesting a return to work.  (Pl.'s Mot. Summ. J., Ex. M53; Def.'s Mot. Summ. J., Ex. 62, at 150:5-15, Docket No. 129.)  Mr. Smith did not respond until May 12, 2006.  (Def.'s Mot. Summ. J., Ex. 62, at 170:19-21; 173:11-18. )  In that response, he explained that the delay was caused by the size and complexity of Sapp's file and his facility's attempts to recover from Hurricane Rita.  (Id.)  On May 26, 2006, he denied Sapp's light-duty request but stated that he would refer her to the DRAC if she sent him current medical documentation.  (Id., Ex. 52.) Subsequently, on September 20, 2006, Sapp's request was submitted to the DRAC.  (Id., Ex. 55.) Sapp has failed to provide any evidence showing that this series of events did not occur in the manner described by Potter.  (See Pl.'s Resp., at 8-10, Docket No. 141.)  Moreover, it is unclear how the USPS's processing of Sapp's requests was unreasonable or supports her claim for disability discrimination.

### 2.  Unlawful Mixed-Motive

To satisfy her burden under the mixed-motive approach, Sapp would have to show that her disability was a motivating factor for the alleged adverse employment actions.  Keelan, 407 F.3d at

341 (citing <u>Rachid</u>, 736 F.3d at 312).  The Court need not consider this line of analysis because Sapp's arguments focus entirely on the alleged falsity of the USPS's explanations.  <u>See</u> <u>Smith v. Xerox Corp.</u>, 602 F.3d 320, 333 (5th Cir. 2010); <u>Rachid</u>, 736 F.3d at 312-13.  The undersigned's independent review of the summary judgment evidence further confirms that there is no evidence demonstrating that an illegitimate reason was a motivating favor for the challenged action.  Accordingly, for the reasons stated above, Sapp's claim for disability discrimination under the Rehabilitation Act should be dismissed.

## VII.  Failure to Accommodate Under the Rehabilitation Act

Prohibited discrimination under the Rehabilitation Act includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . ." 42 U.S.C. § 12112(b)(5)(A) (2008) (prohibiting an employer's failure to reasonably accommodate an employee under the ADA); <u>Delano-Pyle v. Victoria Co.</u>, 302 F.3d 567, 574 (5th Cir. 2002) ("remedies, procedures and rights available under the [Rehabilitation Act] are also accessible under the ADA.").  To prevail on a claim for failure to accommodate, the plaintiff must establish: (1) the employer is covered by the statute; (2) she is a qualified individual with a disability; (3) she can perform the essential functions of the job with or without reasonable accommodation; and (4) the employer had notice of the disability and failed to provide accommodation.  <u>Mzyk v. Ne. Indep. School Dist.</u>, 397 F.App'x 13, 16 n.3 (5th Cir. 2010) (citing <u>Bridges v. Dep't of Soc. Serv.</u>, No. 00-30804, 2001 WL 502797, at *1 (5th Cir. Apr. 27, 2001)).  The employee bears the burden of showing that the employer failed to implement a reasonable accommodation.  <u>Riel v. Elec. Data Sys. Corp.</u>, 99 F.3d 678, 682 (5th Cir. 1996).  The <i>McDonnell-Douglas</i> framework is "unnecessary and inappropriate" for a failure to accommodate

claim.  Weigel v. Target Stores, 122 F.3d 461, 464 (7th Cir. 1997); see also, e.g., Holland v.

Shinseki, No. 3:10-cv-0908, 2012 WL 162333, at *5, *14 (N.D. Tex. Jan. 18, 2012) (applying the

McDonnell-Douglas framework to a retaliation claim under the Rehabilitation Act but not applying

the applying the framework for a failure-to-accommodate claim).

The employee also has the burden to request a reasonable accommodation.  Loulseged v.

Akzo Nobel Inc., 178 F.3d 731, 735 n.4 (5th Cir. 1999).  Unless the employee's disability, resulting

limitation, and necessary reasonable accommodations are obvious, the employee has the burden to

"specifically identify the disability and resulting limitations, and to suggest the reasonable

accommodations." Griffin, 661 F.3d at 224  (quoting E.E.O.C. v. Chevron Phillips Chem. Co., LP,

570 F.3d 606, 621 (5th Cir. 2009)). The employer is obligated to engage in an interactive process

– a meaningful dialogue with the employee to find the best means of accommodating the disability

– once the employee has satisfied this initial burden.  Id.; Chevron Phillips Chem. Co., LP, 570 F.3d

at 622.  The employer is required to engage in the interactive process in good faith.  Chevron Phillips

Chem. Co., LP, 570 F.3d at 622; Loulseged, 178 F.3d at 736.

Sapp argues that the USPS failed to engage in the interactive process.[10]  (Pl.'s Resp., at 10-

16, Docket No. 141) (citing Pl.'s Mot. Summ. J., Ex. CC, at 129:1-20, 201:7-202:15, 222:14-226:13,

Docket No. 132.)  The USPS asserts that it did engage in the interactive process, but it concluded

---

[10]  The USPS's reasonable-accommodation policy sets forth a five-step process to determine whether it can
provide an employee with a reasonable accommodation.  Handbook EL-307, Reasonable Accommodation, An
Interactive Process 9-17, http://usps.com (search "Handbook EL-307, then follow hyperlink) (last visited July 24,
2012).  The five steps of the reasonable accommodation process are: (1) determine whether an individual has a
disability; (2) determine the essential functions of the job; (3) identify the abilities and limitations of the individual;
(4) identify potential accommodations; and (5) determine the reasonableness of the accommodations and select
options.  Id.  The policy states that USPS need not proceed with steps two through five of its policy unless it first
determines that an individual has a covered disability.  Id. at 12.

that Sapp was not a qualified individual with a disability.  (Def.'s Mot. Summ. J., at 55-57, Docket No. 129.)

A.  Initial Burden

      1.  *Disability and Resulting Limitations*

On December 5, 2002, Sapp submitted her first request for reasonable accommodation, attaching medical evaluations from three doctors.  Dr. Kanneganti's evaluation stated that she should not have any interaction with her previous supervisors or subordinate employees and should be relatively isolated. (Id., Ex. 31.)  On the other hand, Dr. Quraishi's single-sentence evaluation provided that Sapp had no limitation whatsoever.  (Id., Ex. 32.)  Finally, Dr. Raichman's evaluation stated that Sapp's condition was chronic, she should have no interaction with her past co-workers, and that she should be isolated from other co-workers and the general public.  (Id., Ex. 33.)  Based on these evaluations, the USPS determined that Sapp's medical limitations were "temporary" and "situational," and therefore, she was not "a person with a disability."  (See, e.g., Def.'s Mot. Summ. J., Ex. 35, Docket No. 129.)

On March 10, 2006, Sapp submitted a subsequent request for reasonable accommodation. She provided a recent evaluation from Dr. Kanneganti, who stated that Sapp's medical condition had not changed since 2003.  (Id., Ex. 53.)  In 2003, Dr. Kanneganti evaluated that Sapp should have no further contact with her former co-workers at Beaumont's REC but that she could supervise approximately fifteen to twenty people.  (Id., Ex. 36.)  Again, the DRAC concluded that she was not

a qualified individual.  (Id., Ex. 56.)  In correspondence from the DRAC to Sapp, the DRAC stated

that Sapp's condition did not affect a major life activity.[11]

### 2. Suggested Accommodations

For Sapp's first request for reasonable accommodation, she requested an assignment to a

supervisor position in Beaumont or Lumberton, Texas.  (Id., Ex. 37.)  The USPS allegedly denied

this request because Sapp's medical limitations stated that she should not interact with the employees

at those locations and could not supervise more than twenty employees, at most.  (Id., Ex. 39.)  The

USPS's denial letter states that Sapp's limitations would be "burdensome and costly since other

supervisors manage over at least 50 employees . . . ."[12]  (Id.)  Allegedly, Sapp did not request any

non-supervisor positions.  (See id., Ex. 37.)

With respect to her second request for reasonable accommodation, Sapp requested an

assignment to another facility as a supervisor, managing "fewer employees."  (Id., Ex. 55.)  Sapp's

request did not specify the locations where she wanted to be assigned nor the number of employees

she could supervise.  (See id.)  During an August 22, 2007 EEOC hearing, Irma Martinez, the

coordinator for the DRAC, corroborated the information in Sapp's request, testifying that Sapp had

expressed interest in supervisor positions at several locations, but Mrs. Martinez did not remember

---

[11]  The ADA defines the term "disability" as: (1) a physical or mental impairment that substantially limits one or more major life activities of an individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment.  42 U.S.C. § 12102(2) (2008).  Prior to the 2008 amendments to the ADA, which became effective in 2009, "[m]ajor [l]ife [a]ctivities mean[t] functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and work."  See Bridges v. City of Bossier, 92 F.3d 329 (5th Cir. 1996) (quoting 29 C.F.R. § 1630.2(i)) (internal quotations omitted).  "'Substantially limits' mean[t] significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  Id. (quoting 29 C.F.R. § 1630.2(j)(3)(i)).  Because the incidents at issue allegedly occurred prior to 2008, the recent amendments are inapplicable to the present case.  See Carmona v. Southwest Airlines, 604 F.3d 848, 857 (5th Cir. 2010)

[12]  Under the ADA, the employer bears the burden of proof to show "undue burden."  Riel v. Elec. Data Sys. Corp., 99 F.3d 678, 682 (5th Cir. 1996).  Potter has not asserted this affirmative defense.  (See Def.'s First Am. Answer, Docket No. 124.)

the specific locations.  (Id., Ex. 62, at 197:11-199:10.)  At least one of the positions was located in Beaumont.  (See id.)

    3.  *Analysis*

        Even though Sapp's medical evaluations are somewhat conflicting, the overall theme is that Sapp should be relatively isolated because she does not interact well with others.  (See id., Exs. 32, 33, 36, 53.)  The USPS's conclusion that her medical limitations were  temporary and situational is dubious.  Accordingly, Sapp satisfied her burden of demonstrating her disability and resulting limitations.  See Griffin, 661 F.3d at 224.

        However, there is no evidence showing that Sapp timely suggested reasonable accommodations.  Instead, the summary judgment evidence shows that she continued to request positions in locations at which she would supervise employees with whom she was not supposed to have further contact.  (See id. Exs. 37, 39, 55; Ex. 62, at 197:11-199:10.)  Moreover, Sapp has not shown that she identified specific positions meeting her medical limitations or that there are any positions at the USPS within those limitations.  (See id, Ex. 35.)

        Finally, Sapp has identified specific positions to which she requested reassignment, but her applications for those positions did not coincide with the explicit reasonable accommodation process set forth by the USPS.  For example, on September 25, 2003, she applied for vacant supervisor positions in Beaumont, Orange, and Vidor (Pl.'s Mot. Summ. J., Ex. M45, Docket No. 132), but the DRAC denied her first request for reasonable accommodation well before that date and she did not submit her second request for reasonable accommodation until March 10, 2006 (see Def.'s Mot. Summ. J., Ex. 39, Docket No. 132).  Likewise, she identifies positions that she applied to in 2007 (Pl.'s Mot. Summ. J., Exs. M90, M99), but again, the DRAC had already denied her second request

for reasonable accommodation by the time she submitted those applications and there is no evidence

showing that Sapp's applications coincided with a  third request for reasonable accommodation (see

Def.'s Mot. Summ. J., Exs. 56, 57).  In this way, Sapp's continuous applications do not constitute

*requests* for reasonable accommodation because the applications do not comply with the process that

the USPS set forth for processing such requests.  See Henderson v. New York Life, Inc., 991 F.Supp.

527, 540 (N.D. Tex. 1997) ([O]nce an accommodation is *properly* requested, the responsibility for

fashioning a reasonable accommodation is shared between the employee and employer.") (emphasis

added).

For these reasons, there is no genuine dispute that Sapp failed to satisfy her initial burden,

and therefore, USPS was not obligated to engage in an interactive process.  See id.[13]  Sapp's failure-

to-accommodate claim should be dismissed.

## VIII.  Discrimination Under Title VII

### A. *Prima Facie* Case of Discrimination Under Title VII

To establish a *prima facie* case of race or gender discrimination under Title VII, the plaintiff

must show that: (1) she belongs to a protected group; (2) she was qualified for the position; (3) she

suffered an adverse employment action; and (4) she was treated less favorably than similarly situated

employees outside the protected group.  See McDonnell Douglas Corp., 411 U.S. at 802; McCoy,

492 F.3d at 556; Rachid, 376 F.3d at 309.  For a discrimination claim under Title VII, only "ultimate

---

[13] Assuming *arguendo* that Sapp satisfied her initial burden, there would be a genuine dispute as to whether the USPS failed to engage in an interactive process with Sapp.  Sapp provides testimony purportedly showing that the DRAC and the SWRAC failed go beyond the first step of the USPS's reasonable-accommodation process.  (Pl.'s Mot. Summ. J., Ex. CC, at 129:1-20, 201:7-202:15, 222:14-226:13, Docket No. 132.)  Potter disagrees with Sapp's evidence and provides his own evidence purportedly showing that the USPS complied with its duty to engage in the interactive process. (Def.'s Mot. Summ. J., Ex. 35, Docket No. 129.)  Accordingly, this claim would survive summary judgment.

employment decisions" constitute adverse employment action.  White, 548 U.S. at 67; McCoy, 492 F.3d at 560.

The second, third, and fourth elements of Sapp's *prima facie* case are at issue in the summary judgment motions.  The incidents allegedly supporting Sapp's Title VII discrimination claims are identical to those purportedly supporting her claim for disability discrimination.  As previously discussed, Sapp fails to establish a *prima facie* case of disability discrimination, in part, because none of the relevant incidents constitute adverse employment action.  For that same reason, Sapp is unable to establish a *prima facie* case of Title VII discrimination.  Moreover, she fails to show that she was treated less favorably than similarly situated employees outside her protected groups – race and gender.  Finally, even if she had established a *prima facie* case, Sapp's Title VII discrimination claims would still fail because she has not shown pretext or unlawful mixed motive. The majority of this analysis is contained above.  See supra, § VI.  In the analysis below, the undersigned explains how Sapp fails to show that she was treated less favorably than similarly situated employees outside her protected groups.

*1. Similarly Situated Employees*

In Sapp's summary judgment motion, she generally alleges that other employees were reassigned non-competitively.  (Pl.'s Memo., at 33, Docket No. 132.)  This allegation is primarily based on reassignments that occurred as a result of the RIF.  (Id. at 35) (citing Ex. Z9.)  Sapp argues that the vacant positions were within her medical limitations.  (Id.)  This argument is not properly before the Court.  Sapp failed to administratively exhaust her claims arising from the RIF, and therefore, those claims were dismissed pursuant to Potter's "Motion to Dismiss" (Docket No. 35). (See Report and Recommendation, at 7, Docket No. 55.)

The only specific employee who Sapp discusses is Mrs. Gilchrist.  (Pl.'s Memo. 33.)  Sapp argues that Mrs. Gilchrist's light-duty request was approved but that Sapp did not even receive a response to her light-duty request.  (Id.; Def.'s Mot. Summ. J., Ex. 48, at 179:9-17, Docket No. 129.) Again, the administrative processing of Sapp's reasonable-accommodation request does not constitute an adverse employment action.  See Benningfield, 157 F.3d at 376-78.  Putting that issue aside, Mrs. Gilchrist is also female, so the processing of Mrs. Gilchrist's request does not support Sapp's gender-discrimination claim.  See McDonnell Douglas Corp,, 411 U.S. at 802; McCoy, 492 F.3d at 556; Rachid, 376 F.3d at 309.  Assuming that Mrs. Gilchrist is white, Sapp has nonetheless failed to provide evidence demonstrating that she and Mrs. Gilchrist were similarly situated under nearly identical circumstances.  See Berquist v. Wash. Mut. Bank, 500 F.3d 344, 353 (5th Cir. 2007). Instead, the evidence shows that Mrs. Gilchrist had a physical limitation, whereas Sapp's medical condition was psychological in nature.  (See id. at 175:24-176:3.)  Accordingly, for these reasons and those previously discussed, Sapp's Title VII discrimination claims should be dismissed.

### IX.  Retaliation Under the Rehabilitation Act and Title VII

A.  *Prima Facie* Case and Legitimate, Non-Retaliatory Reasons

To establish a *prima facie* case of retaliation under Title VII or the Rehabilitation Act, the plaintiff must demonstrate that: (1) she engaged in protected activity; (2) she was subject to adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action.  Hernandez, 670 F.3d at 657; Seamen v. CSPH, Inc., 179 F.3d 297, 301 (5th Cir. 1999);  Kebiro v. Wal-Mart Stores, Inc., 568 F.Supp.2d 747, 753 (E.D. Tex. 2005) (citing Long v. Eastfield Coll., 88 F.3d 300, 304 (5th Cir. 1996)).

### 1.  Protected Activity

For reasons of clarity, the undersigned will elucidate Sapp's protected activity.  An employee has engaged in a protected activity if: (1) she has opposed a practice prohibited by Title VII or the Rehabilitation Act; or (2) has participated in any manner in a proceeding under the statutes.  See Haynes v. Penzoil Co., 207 F.3d 296, 299 (5th Cir. 2000); Seaman v. CSPH, Inc., 179 F.3d 297, 301 (5th Cir. 1999).

On November 8, 2001, Sapp filed Initial EEO #1, 1-G-774-0001-02, asserting discrimination claims based on her race and gender.[14]  On November 20, 2002, she filed Amendment to Initial EEO #1, 1-G-774-0001-003, alleging claims for Title VII discrimination, disability discrimination (disparate treatment and failure to accommodate), hostile work environment, and retaliation for prior EEO activity.  Finally, on June 12, 2006, Sapp filed EEO #2, 1-G-774-0002-06, asserting claims for retaliation and disability discrimination (failure to accommodate).  These claims constitute Sapp's protected activity.  See Haynes, 205 F.3d at 299.

### 2.  Adverse Employment Action and Causal Connection

For a retaliation claim under Title VII and the Rehabilitation Act, adverse employment action is that which a reasonable employee would find materially adverse, meaning that the action might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." White, 548 U.S. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)); accord

---

[14]  Sapp's Initial EEO #1 purportedly alleged a retaliation claim.  (See Def.'s Mot. Summ. J., Ex. 47., Docket No. 129.)  The summary judgment evidence does not clearly indicate the basis for this retaliation claim.  However, in October 2001, Sapp filed a charge with the National Labor Relations Board (NLRB) in opposition to a hiring practice decision allegedly affecting union members.  (Docket No. 39, Ex. E3.)  The NLRB refused to issue a complaint.  (Id.)  The undersigned assumes that the "protected activity" referenced in Initial EEO #1 is the October 2001 incident with the NLRB.  For purposes of Title VII and the Rehabilitation Act, this incident does not constitute protected activity.  See Haynes, 205 F.3d at 299.

Hernandez, 670 F.3d at 657 (citing Aryain v. Wal-Mart Stores Tex. LP, 534 F.3d 473, 484 (5th Cir.

2008)).  This materiality requirement separates "significant from trivial harms."  White, 548 U.S.

at 68.  "[P]etty slights, minor annoyances, and simple lack of good manners" are non-actionable.

Aryain, 534 F.3d at 484.

     In the Fifth Circuit, the "causal link" element of a plaintiff's *prima facie* case is not held to

a "stringent" standard.  Long v. Eastfield Coll., 88 F.3d 300, 305 n.4 (5th Cir. 1996); accord Nunley

v. City of Waco, 440 F.App'x 275, 281 (5th Cir. 2011) (unpublished).  "[A] plaintiff need not prove

that her protected activity was the sole factor motivating the employer's challenged decision . . . ."

Long, 88 F.3d at 305 n.4.

     Once the plaintiff satisfies his *prima facie* burden and the employer presents evidence

showing that it acted properly, "the fact-finder must decide whether retaliation was the but-for cause

for the employer's action."  Hernandez, 670 F.3d at 657 (citing Long, 88 F.3d at 305 n.4).

> [The] plaintiff must demonstrate a conflict in substantial evidence on the ultimate
> issue of but for causation.  Evidence is substantial if it is of such quality and weight
> that reasonable and fair-minded men in the exercise of impartial judgment might
> reach different conclusions.  Temporal proximity, standing alone, is not enough.

Id. at 658  (quotations and citations omitted).

     *3. Analysis*

     Sapp alleges that the following incidents support her retaliation claims: (1) on April 26, 2002,

her six-week request for advanced sick leave was denied; (2) in 2002, she was placed on LWOP

status; (3) the numerous incidents in which the USPS failed to timely respond to requests or provide

forms; and (4) the USPS failed to engage in the interactive process and reassign her non-

competitively as a reasonable accommodation for her disability.  Given the flexible standard for

establishing a *prima facie* case of retaliation, the undersigned assumes that Sapp has satisfied this initial burden.  See id.; White, 548 U.S. at 68; Aryain, 534 F.3d at 484.

As previously discussed, Potter has articulated legitimate explanations for these incidents. First, Potter argues that Sapp's request for sick leave was not in compliance with the USPS's Advanced Sick Leave Policy and that she had already exhausted her sick leave by the date of her request.  (Id., Ex. 15; Ex. 48, at 612:4-613:22.)  Second, he explains that the USPS placed Sapp on LWOP status pursuant to her own request.  (Id., Ex. 29; Ex. 48, at 313:24-315:1.)  Third, Potter reasons that: (1) there was no delayed response in 2003; (2) the USPS's response in 2006 was delayed because of the complexity of Sapp's file; and (3) the requested forms did not exist.  (Id., Exs. 30-39; Ex. 48, at 228:4-229:7, 244:10-245:3, 312:13-21, 320:6-321:6, 613:25-615:1, 726:20-727:14; Ex. 62, at 170:19-21; 173:11-18. )  Finally, Potter explains that the USPS did not proceed beyond the first step of its reasonable-accommodation process, in part, because Sapp failed to satisfy her burden of suggesting a reasonable accommodation.    (See id., Exs. 35, 37, 39, 55-57; Ex. 62, at 197:11-199:10.)

C.  Pretext

   *1. Legal Standard*

Because Potter articulated legitimate, non-retaliatory reasons for the alleged adverse employment actions, the burden shifts back to Sapp to show that the proffered reasons were merely a pretext for retaliation.  See Seaman v. CSPH, 179 F.3d 297, 301 (5th Cir. 1999).[15]  "To defeat a motion for summary judgment, a plaintiff must demonstrate 'a conflict in substantial evidence on

---

[15]  As previously discussed, Sapp does not argue that Potter had an unlawful mixed motive and there is no evidence to support such a theory, so the Court need not address that line of analysis.  See Smith, 602 F.3d at 333; Rachid, 736 F.3d at 312-13.

[the] ultimate issue of 'but for' causation." <u>Hernandez</u>, 670 F.3d at 658 (quoting <u>Long</u>, 88 F.3d at 308).  "Evidence is 'substantial' if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." <u>Id.</u> (quoting <u>Long</u>, 88 F.3d at 308) (internal quotations omitted).  This burden is more stringent than the causation element of the plaintiff's *prima facie* case.  <u>Long</u>, 88 F.3d at 305 n.4.  Temporal proximity, standing alone, is insufficient to prove a causal link between the protected activity and the adverse employment action.  <u>Hernandez</u>, 670 F.3d at 658 (citing <u>Strong v. Univ. Healthcare Sys., L.L.C.</u>, 482 F.3d 802, 808 (5th Cir. 2007)).

 *2.  Analysis*

 Sapp first attempts to show that Potter's reasons are a mere pretext through quotes complimenting her past performance at Beaumont's REC.  (Pl.'s Memo., at 47- 48, Docket No. 132.)  For example, Mr. Smith testified during a November 18, 2003 EEOC hearing that "[Sapp] was a good supervisor, always considered very bright . . . ." (Def.'s Mot. Summ. J., Ex. 48, at 736:10-11, Docket No. 129.)   However, Sapp's past performance is irrelevant to the alleged adverse employment actions discussed above.  The undersigned suspects that Sapp references this evidence in order to show that she was qualified for the positions to which she requested reassignment, but her qualifications were never at issue.  Instead, Sapp had the burden to show that the positions were within her medical limitations, which she failed to do.

 Second, Sapp attempts to undermine the credibility of Potter's explanations by providing internal communications among the USPS's law department.  There are two e-mail chains that she repeatedly cites.  A May 1, 2007 e-mail chain states: "My first question is how can somebody possibly have been off duty since 2001 and not have been removed by now?  If she's not on pre-

approved annual or sick leave and isn't on OWCP's roles, then how is [it] that she's just out there on LWOP?"  (Pl.'s Mot. Summ. J., Ex. T18, Docket No. 132.)  A December 4, 2007 e-mail chain states: "We absolutely don't want this liability back . . . We do not want to bring this woman back. It seems to me that . . . our back pay liability is relatively small . . . ."  (Id., Ex. Z13.)  The only alleged adverse employment action that these e-mail chains could relate to is Sapp's claim that the USPS failed to engage in the interactive process.  However, this evidence is not substantial because it does not create a conflict as to whether Sapp suggested reasonable accommodations within her medical limitations.  See Hernandez, 670 F.3d at 658.

Third, Sapp alleges that there is a temporal proximity between her EEOC activity and the adverse employment actions.  (Pl.'s Resp., at 25-26, Docket No. 141.)  The summary judgment evidence demonstrates that such temporal proximity does not exist.  Sapp filed EEOC complaints on November 8, 2001, November 20, 2002, and June 12, 2006.  She submitted her DRAC requests on May 8, 2003, and May 26, 2006.  The first request is significantly after Sapp's early EEOC activity, and the second request predates Sapp's last EEOC complaint.[16]  Finally, even if there was evidence of temporal proximity, there is no other evidence of pretext, so Sapp could not defeat summary judgment.  See Hernandez, 670 F.3d at 658.  For these reasons, Sapp's retaliation claims should be dismissed.

---

[16]   Likewise, her request for sick leave was denied on April 26, 2002, and she was placed on LWOP status sometime after May 30, 2002 – when she requested that USPS restore her annual leave.

## X.  Hostile Work Environment Under Title VII and the Rehabilitation Act

A.  Legal Standard

To prevail on a hostile work environment claim under Title VII or the Rehabilitation Act, the plaintiff must prove: (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected trait; (4) the harassment affected a term, condition, or privilege of employment, and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.  See Harvill v. Westward Comms., L.L.C., 433 F.3d 428, 434 (5th Cir. 2005); Soledad v. U.S. Dept. of Treasury, 304 F.3d 500, 506 & n.8 (5th Cir. 2002); Flowers v. S. Regional Physician Servs., 247 F.3d 229, 235 (5th Cir. 2001).

 "For harassment to affect a term, condition, or privilege of employment, it must be objectively and subjectively abusive."  Hockman v. Westward Commc'ns, LLC, 407 F.3d 317,  325 (5th Cir. 2004).  "Workplace conduct is not measured in isolation."  Hernandez, 670 F.3d at 651 (quoting Ramsey, 286 F.3d at 268) (internal quotations omitted).  A court considers the following factors to determine whether a work environment is sufficiently hostile: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or humiliating, or merely an offensive utterance; (4) whether the conduct interferes with work performance; and (5) whether the complained-of conduct undermines the plaintiff's workplace competence.  Hockman, 407 F.3d at 325-26.  The alleged harassment must be so severe and pervasive that it destroys the employee's opportunity to succeed in the workplace, and it must be more than rude or offensive comments, teasing, or isolated incidents.  Id. (citing Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 874 (5th Cir. 1999)); see also Hernandez, 670 F.3d at 652 (holding that isolated incidents do not establish an abusive work environment).

B.  Analysis

Sapp alleges that the following categories of incidents constitute harassment and support her

hostile work environment claims: (1) the incidents with her subordinate employees in 2001; (2) Don

Hale's proposed solutions to the increasing number of incidents between Sapp and her co-workers;

(3) the USPS's alleged failure to timely respond to the OWCP inquiry in 2002; (4) the leave issues

occurring in 2002; (5) the USPS's alleged failure to provide requested forms; (6) the USPS's alleged

failure to timely respond to her return-to-work requests; and (7) the USPS's alleged failure to engage

in the interactive process in 2002 and 2003.  Except for the first and second categories, all of the

above incidents allegedly occurred after Sapp stopped reporting to work on September 16, 2001.

A hostile work environment claim "necessarily presupposes that there *be* a hostile work environ-

ment."  Kurth v. Gonzales, 472 F.Supp.2d 874, 883 (E.D. Tex. 2007) (Hines, J.) (emphasis in

original).  For the vast majority of Sapp's claims, there was no *de facto* work environment capable

of being hostile.  See id.  Accordingly, only the first two categories of incidents could potentially

support Sapp's claims.  See id.

Sapp has failed to provide any evidence to create a genuine dispute with respect to these

claims.  First, there is no evidence that the incidents between her and her subordinate employees in

2001 or that Mr. Hale's proposed solutions to those incidents had any relation whatsoever to Sapp's

gender, race, or disability[17].  Second, there is no evidence that Mr. Hale's proposed solutions were

*harassing*.  Instead, the summary judgment evidence shows that he was merely attempting to remedy

problems between Sapp and her subordinate employees.  (See Def.'s Mot. Summ. J., Ex. 7; Ex. 48,

at 617:11-18, 618:1-25, 737:4-22.)  Finally, there is no evidence that any of the alleged incidents

---

[17]  She was not even diagnosed with a disability until after she stopped reporting to work.

were so pervasive or severe as to alter the conditions of her employment or to create a hostile work environment.  See Hernandez, 670 F.3d at 651-52; Hockman, 407 F.3d at 325-26;  Soledad, 304 F.3d at 506 & n.8.  The grievances filed against Sapp by her subordinate employees in July and August of 2001 cannot support her claims.  These employees had the right to utilize the grievance procedure, and Sapp's supervisors actually supported her during the grievance process. (See Def.'s Mot. Summ. J., Ex. 3, Docket No. 129.)

For these reasons, Sapp's hostile work environment claims should be dismissed.

## XI.  Recommendations

The court should deny Sapp's "Amended Motion for Summary Judgment" (Docket Nos. 64, 132), grant Potter's "Motion for Summary Judgment" (Docket No. 129), and dismiss this lawsuit with prejudice

## XII.  Objections

Objections must be:  (1) specific, (2) in writing, and (3) served and filed within fourteen (14) days after being served with a copy of this report.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b), 72(b).

A party's failure to object bars that party from:  (1) entitlement to de novo review by a district judge of proposed findings and recommendations, see Rodriguez v. Bowen, 857 F.2d 275, 276-77 (5th Cir. 1988), and (2) appellate review, except on grounds of plain error of unobjected-to factual findings and legal conclusions accepted by the district court, see Douglass v. United Servs. Auto. Ass'n., 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

SIGNED this 26th day of July, 2012.

_____
Zack Hawthorn
United States Magistrate Judge